IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**YVETTE E. ROMERO-RAMIREZ**,

    Plaintiff,

v.

Civil No. 15-1985 (BJM)

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

## OPINION AND ORDER

Yvette E. Romero-Ramirez ("Romero") seeks review of the Commissioner's determination that she is not disabled or entitled to benefits under the Social Security Act ("Act"), 42 U.S.C. § 423, as amended, and asks for judgment to be reversed and an order awarding disability benefits. (Docket Nos. 1, 20). The Commissioner answered the complaint and filed a memorandum of law in support of her position. (Docket Nos. 12, 26). This case is before me by consent of the parties. (Docket Nos. 4-8). After careful review of the administrative record and the briefs on file, the Commissioner's decision is vacated and remanded for proceedings consistent with this opinion.

## STANDARD OF REVIEW

The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity[1] ("RFC") and determines whether the impairments prevent the claimant from doing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as well as her age, education, and work experience. If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

---

[1] An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of his insured status, or her date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

Romero was born on January 18, 1964. Transcript ("Tr.") 308. She has a high school education and worked as a data entry clerk (semi-skilled, sedentary work) and as an office clerk (semi-skilled, light work). Romero claims to have been disabled since November 6, 2009 (alleged onset date) at 45 years of age[2] due to musculoskeletal impairments resulting in cervical, dorsal, and lumbar pain, and bilateral manipulative limitation due to carpal tunnel syndrome. Romero applied for a period of disability and disability insurance benefits on July 7, 2011, and last met the Social Security Administration's ("SSA") insured status requirements on June 30, 2015 (date last insured). She did not engage in substantial gainful activity during this period. Tr. 19, 21, 25, 41-42, 78, 98, 212, 308, 315, 320.

*Treating Physicians*

*Dr. Jose A. Acevedo*

Dr. Jose A. Acevedo ("Dr. Acevedo") reported treating Romero beginning November 11, 2002, about twice a year, for high blood pressure, severe degenerative disc disease of the cervical spine, and major depression with panic attacks. Clinical signs included tenderness, muscle spasm and weakness, impaired sleep, abnormal posture, reduced grip sensation, and anxiety. He prescribed medications and physical therapy. Visits from 2002 until 2010 generated handwritten notes that are mostly illegible, but follow-up notes for visits from 2011 through 2013 show continued treatment with medications for degeneration of cervical intervertebral disc,

---

[2] Romero was considered to be a younger individual (Tr. 25), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

displacement of thoracic intervertebral disc, lumbago, cervicalgia, hyperlipidemia, hypertension, and insomnia.

In June 2013, Dr. Acevedo reported to the SSA that Romero suffered from severe pain, muscle spasm, tenderness, weakness, impaired sleep, abnormal posture, significant limitation of motion, reduced grip strength, anxiety, and depression. Her cervical and lumbar range of motion was between 20% and 50% in extension, flexion, rotation, and bending. Romero also suffered from severe headaches associated with her cervical spine impairments, which caused inability to concentrate, impaired sleep, exhaustion, mood changes, and mental confusion. Her headaches improved with medications and resting in a quiet dark place.

Dr. Acevedo assessed that Romero could sit for 45 minutes at a time, stand for one hour, and sit, stand, and walk for less than two hours in an eight-hour workday. Romero needed to walk around every 30 minutes for 10 minutes. Romero also needed to shift positions at will from sitting, standing, or walking, and take unscheduled breaks every one-and-a-half to two hours to rest for at least 30 minutes. She could rarely lift less than 10 pounds, turn her head right or left, look up, hold her head in a static position, twist, stoop, crouch, or climb ladders. She could never lift 10 pounds or more, look down, or climb stairs. Romero could use her hands for manipulative activities (grasp, turn, and twist objects) and for fine manipulation for 30 minutes. Dr. Acevedo also assessed that Romero's pain was severe enough to interfere constantly with her ability to pay attention and concentrate in performing even simple work tasks. In his opinion, Romero could not work. Tr. 21-22, 26-27, 465-540.

### *Dr. Jesus M. Nieves*

The record contains treatment notes and medication prescriptions for mental health issues from seven appointments between August 2012 and May 2013 with Dr. Jesus M. Nieves ("Dr. J. Nieves). Romero went to all of her appointments accompanied by her mother, husband, or a friend. Tr. 148-152, 459-464. Romero was referred to Dr. J. Nieves by Dr. Acevedo. Tr. 464.

During the first visit on August 21, 2012, Romero informed Dr. J. Nieves that she started suffering from carpal tunnel syndrome in 2008, and later developed strong back pain that kept worsening. Her conditions depressed her. She could not sleep, was forgetful, and felt nervous and irritated. Her son told her she constantly repeated things. Dr. J. Nieves noted that Romero looked well-groomed and was oriented, cooperative, logical, coherent, and relevant. Her affect was depressed. Her recent and present memory were poor. Her judgment and introspection were

appropriate. She did not have deliriums, hallucinations, or suicidal ideas. Dr. J. Nieves diagnosed major depression and prescribed medications. Tr. 152, 464.

On September 11, Dr. J. Nieves noted that Romero seemed depressed and disoriented. She still felt pain despite of receiving physical therapy. Romero told Dr. J. Nieves that she sometimes felt like someone was calling her. Dr. J. Nieves again noted that Romero looked well-groomed and was oriented, cooperative, logical, coherent, and relevant. She did not have deliriums or significant hallucinations. Her affect was depressed. Her recent memory was poor, and her past memory had some gaps. Her judgment and introspection were appropriate. Tr. 151, 463.

On October 22, Romero felt bad because her surgeon told her she would need neck surgery. The rest of that treatment note was cut out in the copy contained in the transcript. Tr. 151, 463. On December 5, Romero felt ugly, fat, and useless. She felt angry that she could not exercise because she could hurt herself and because she had to depend economically on her family. She felt physically sore. Her medication gave her relief but was hard on her stomach. Dr. J. Nieves's assessment of her mental conditions on that day was the same as in the previous appointments, but now he also found she had auditory and visual hallucinations. Tr. 150, 462.

On January 14, 2013, Romero was worried and nervous about an upcoming back surgery. She felt permanent pain in her neck, legs, shoulders, and hands, but hoped her pain would improve with the surgery. She stated being forgetful. She no longer saw things but continued to have auditory hallucinations, like people arriving at her house. Dr. J. Nieves noted that Romero was distracted, and that her short, recent, and past memory were poor. Tr. 149-150, 461-462.

By March 12, Romero had already had surgery and she noted that it gave her relief from pain and numbness. She was sleeping better, and was calmer during the day, although she would get nervous when going out. Tr. 149, 461.

On May 14, Romero told Dr. J. Nieves that she was not well. She felt hand pain again and that depressed her because she thought her hand condition would improve post-surgery. She admitted that her legs felt better. She also claimed to forget everything and complained of hearing noises, sleeping very little, and having interrupted sleep. She would refuse to be taken out by her family. Dr. J. Nieves noted that Romero looked well-groomed and was oriented, cooperative, logical, coherent, and relevant. She did not have deliriums or suicidal ideas, but did have auditory hallucinations. Her affect was depressed. Her short, recent, and past memory were poor. Her judgment and introspection were appropriate. Tr. 148, 460.

*State Insurance Fund Treatment*

Starting in 2008, Romero received treatment under the auspices of the State Insurance Fund Corporation ("SIF") for bilateral severe carpal tunnel syndrome, bilateral tenosynovitis, dorsolumbar degenerative disc disease, L5-S1 disc herniation, degenerative joint disease, cervical disc herniation C5-C6, and cervical lumbar myositis. Tr. 96-141, 364, 382, 408-440.

A cervical Magnetic Resonance Imaging ("MRI") test dated January 8, 2008 showed small posterior herniation of the C5-C6 discs and spondylosis. There was no evidence of central spinal canal or neural foramina stenosis. Tr. 25, 440.

On October 21, 2009, Romero assessed her pain as a 3 on a scale of 1 to 10. On November 12, Romero informed a physical therapist that she felt no cervical or dorsal pain and less paresthesia in her hands. She independently exercised, and her range of motion was full or near full. Romero could independently stand and sit. She presented tenderness of the cervical area but did not have significant postural deviation. Tr. 27, 527.

Cervical spine x-rays dated November 3, 2010 showed degenerative disc disease, spondylosis, and uncovertebral hypertrophy of the cervical spine, most marked between the C5-C6 vertebrae. It also showed mild right-sided curvature that could be positional or related to a spasm. A lumbar x-ray showed mild straightening of the lumbar spine, L5-S1 displaced narrowing with endplate changes, and spondylosis. The sacroiliac joints were intact with left pelvic phleboliths. Tr. 25, 389.

On January 25, 2011, an electro-diagnostic examination revealed severe bilateral median nerve entrapment across the carpal tunnel. Romero's lower extremities were normal. Tr. 25, 386, 391, 425.

Follow-up treatment notes, some from Dr. Javier Salas-Rivera, from December 2010; February, March, and July 2011; and February and March 2012 indicate that physical therapy continued to be recommended for her bilateral carpal tunnel syndrome. Romero expressed pain during palpation of the back, felt pain and numbness with limitation of movement in both hands, showed inflammation in the cervical and lumbar area, and was prescribed medications for the pain and referred to occupational therapy. During this period, her reports on daily living activities indicate that she increasingly needed help to perform personal grooming routines, feeding, and house chores. However, Romero showed normal range of motion in the back and wrists. On July 12, 2011, Romero showed lumbar pain and inflammation. September 2011 occupational therapy

treatment notes reflect that Romero attended the appointment alone and walked without difficulty. The nurse did not observe inflammation on either hand. In November 2011 and January and February 2012, Romero was observed arriving alone, oriented, and walking without difficulty. Romero presented inflammation of the cervical and lumbar area upon palpation and pain and numbness in both hands, but she assessed her pain as a 1-2 in a scale of 1-10. She was advised to rest her hands. In November 2011, her wrist movement was limited and Romero was ordered to use wrists braces. The record also shows that a hand surgeon evaluation was pending. Tr. 25-26, 97-100, 102-103, 109-118, 125-128, 382-388, 410-419, 427-430.

Dr. Roberto Nevares ("Dr. Nevares"), hand surgeon, reported on July 7, 2011 that Romero, who is right-handed, complained of bilateral hand pain and numbness. A physical examination revealed bilateral thenar weakness but no atrophy and some tenosynovitis without triggering in her right hand. A nerve conduction study showed that Romero suffered from severe bilateral carpal tunnel syndrome. Romero would be treated with wrist splinters, steroid injections, and occupational therapy. Dr. Nevares assessed that Romero would most likely require surgery. Tr. 25, 382, 421. On September 2, 2012, Dr. Nevares opined again that Romero would most likely require surgery, after her cervical and lumbosacral discogenic disease was taken care of. Tr. 26, 409.

On April 2, 2012, a lumbosacral MRI showed central intervertebral disc herniation at L5-S1 with extruded fragment and concentric intervertebral disc bulges at L3-L4 and L4-L5. A cervical MRI showed intervertebral disc desiccation with central intervertebral disc herniation producing mild central spinal canal stenosis at C5-C6 level. Tr. 26, 423-424.

Dr. Angela Manana ("Dr. Manana"), SIF neurologist, reviewed Romero's record and assessed on May 25, 2012 that Romero's cervical history and physical examinations were compatible with chronic cervical and dorsolumbar degenerative disease, cervical disc herniation in the C5-C6, severe bilateral CTS, and cervical and lumbar myositis. Dr. Manana recommended that Romero follow up with the hand surgeon, and continue with physical therapy for the lumbar and cervical areas and pain medications. Dr. Manana also referred Romero to a pain clinic. Despite allegations of disabling hand limitations, Dr. Manana noted that the treating physicians noted only mild weakness in her upper extremities. Romero's gait was normal. Tr. 441-446.

Dr. Hector Vargas-Soto ("Dr. H. Vargas"), orthopedic surgeon, operated on Romero on January 25, 2013 for cervical spurs and radiculopathy. Tr. 27, 142, 454. The record contains two

pages that are Dr. H. Vargas's October 11, 2012 handwritten notes indicating Romero's chief complaint, past medical treatment, location and radiation of pain, aggravating factors, physical examination findings, assessment, and plan. Unfortunately, the portions with handwriting are illegible and I, as a lay person, cannot interpret the markings in the physical examination section. Tr. 145-146, 457-458. His operation record is illegible. Tr. 144, 456. A *Hospital de la Concepcion* discharge document dated January 26 states that Romero recovered and was prescribed Percocet. Tr. 142, 454.

February 2013 progress notes indicate that Romero had severe difficulty with her fine motor coordination (buttoning and unbuttoning), continued with numbness in her hands, had strong difficulty in performing her personal grooming and feeding, and needed increased assistance. Tr. 127-128, 429-430.

The record contains two reports of hand surgery by Dr. Oscar Vargas ("Dr. O. Vargas") of the *Instituto de Cirugia Plastica del Oeste, Inc*. The first surgery was on July 23, 2013 for her left hand. Tr. 542-543. Romero had right hand surgery performed on February 7, 2014. Tr. 209-210, 548.

*Procedural History*

Romero filed for disability insurance benefits on July 7, 2011, claiming disability due to carpal tunnel syndrome, pinched nerves, neck pain, and low back pain starting November 6, 2009. She did not claim suffering from a mental condition. Tr. 19, 212, 308.

On July 26, 2011, Romero stated in a disability report that her bilateral carpal tunnel syndrome, pinched nerves, neck pain, and low back pain limited her ability to work. Tr. 318-323. A SSA interviewer stated in a disability report that Romero was not observed having difficulty standing, sitting, walking, using her hands, or writing. Romero was alert, coherent, answered questions promptly, and had no difficulty concentrating or understanding. Tr. 316-317.

Romero reported in a function report dated August 14, 2011 that her daily routine included going to the bathroom, brushing her teeth, taking a shower, preparing meals and eating, doing house chores (cook, clean, iron, do laundry), using the computer, watching television or reading the newspaper, feeding her pets, and going to appointments at the SIF or shopping. She claimed that before her conditions existed, she could bathe her pets, wash her car, and wash windows. The numbness and pain she felt in her arms and hands affected her ability to sleep, dress, bath, shave, care for her hair, cook, and garden. She did not need to be reminded to take care of her personal

needs and grooming, or to take her medications, or to do household chores. She was able to drive, go out alone, shop for groceries and clothing, and take care of her finances. Her hobbies included going to the beach once a week, reading daily for half an hour at most because her neck would hurt, talking on the phone daily, and spending time with others. She had no problem getting along with family, friends, neighbors, or others. She check-marked that her conditions affected her ability to get up, squat, bend, stand, walk, and use her hands. She did not check the boxes for mental limitations in memory, completing tasks, concentration, understanding, following instructions, and getting along with others. She did not have unusual behavior or fears. Reading positive thinking articles helped her handle stress. She claimed that she felt pain and numbness in her hands. She could lift five pounds, walk for one hour before needing to stop and rest for 15 minutes, and could not reach, bend, or stand for too long. Walking gave her lower back pain. She slept with wrist braces as prescribed by a doctor. Tr. 22, 70-77, 324-331.

Dr. Alfredo Perez-Canabal ("Dr. Perez"), consultative neurologist, examined Romero on January 19, 2012 and diagnosed cervical myositis, low back pain, and carpal tunnel syndrome. Dr. Perez found that she had head, neck, and back tenderness. Upon examination, she did not present hand joint pain, tenderness, swelling, nodes, changes in pigmentation, contractures, sensory changes, deformities or atrophy. She was able to grip, grasp, pinch, finger tap, oppose fingers, button a shirt, pick up a coin, and write with both hands. The Tinel and Phalen Tests were positive for both hands, and the Babinski and Hoffman tests were negative. Her gait was normal. Her shoulder range of motion was normal for forward elevation, abduction, adduction, and internal rotation, except for external rotation which was 40 out of 90 degrees. As to her spine, flexion, extension, and rotation were normal, except for flexion and extension of the lumbar region, which was a 60 out of 90 degrees. Her elbow, wrist, finger, knee, hip and ankle range of movement were normal. Her extremities and gait were normal. Tr. 27, 392-402.

On February 2, 2012, Dr. Pedro Nieves ("Dr. P. Nieves"), a non-examining medical consultant (internist) for the Disability Determination Services ("DDS"), examined the medical record, finding that Romero had medically determinable impairments (carpal tunnel syndrome and discogenic and degenerative disorders of the back) which could reasonably be expected to produce her pain or other symptoms but were not of the intensity, persistence, and functionally limiting effects claimed by Romero, specifically as to walking. Dr. P. Nieves assessed that Romero could occasionally (cumulatively 1/3 or less of an 8-hour day) lift and/or carry 20 pounds, frequently

(cumulatively more than 1/3 up to 2/3 of an 8-hour day) lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for about 6 hours, sit (with normal breaks) for about 6 hours, unlimited pushing and/or pulling (including operation of hand and/or foot controls), frequently climb ramps/stairs, occasionally climb ladders/ropes/scaffolds, unlimited balancing, occasionally stoop (bend at the waist), frequently kneel, frequently crouch (bend at the knees), and occasionally crawl. Dr. P. Nieves also found that Romero had manipulative limitations. She could unlimitedly reach in any direction, including overhead, but was limited as to both hands in her ability to handle (gross manipulation), finger (fine manipulation), and feel. She could frequently handle, finger and feel with both hands. Dr. P. Nieves found no visual, communicative, or environmental limitations. Dr. P. Nieves believed that Romero had the RFC to perform past relevant work. Tr. 215-218, 405.

Romero's claim was denied on February 3, 2012. Tr. 66-69, 219-226.

In a disability report dated April 12, Romero claimed that her conditions had changed. She felt a lot of pain from her neck to her lower back and in her legs. The pain in her neck extended to her shoulders and arms, which would go numb. She lost strength in her hands and could not grip. She could not spend too much time standing, sitting, or walking. She needed help getting back up from bending over. Her neck would lock up frequently. She could not perform repetitive movements. She had difficulty showering, her hands and arms would go numb when trying to wash her hair, and she needed help to wash her legs and feet. She was able to perform some household chores when her conditions allowed, but needed to take frequent breaks because of the pain. Tr. 342-347, 362.

In another function report dated May 10, Romero stated that she could not spend much time on a computer using the mouse and keyboard or be on the phone for an extended period of time because her hands would hurt and go numb. She could no longer file, carry documents, perform data entry, or stand, sit, or walk for too long. She would get back pain and could not bend. She reported the same daily activity routine she had previously reported, and added that she could not lift heavy objects, bend, walk, bathe the pets, wash the car or windows, swim like before, hold objects for a long time, sleep well, or exercise. She would do one house chore at a time. If she vacuumed, she would rest for 20 minutes. Her husband would carry the hamper and she would place clothes in the washer. Her husband would clean the bathroom and windows and do all the yard work. At night, she couldn't sleep because she felt pain in her hand and neck and would constantly toss and turn while trying to find a comfortable position. Her conditions caused

difficulty in bending, lifting her arms, and reaching when getting dressed and bathing. She would feel pain when washing her hair, and could not use the blow dryer. She could shave but with difficulty and pain. While eating, she could not hold anything for a long time and would drop her utensils. She now claimed to need help or reminders to take her medicine, and would place her medications in the kitchen so as to see them and not forget to take them. She could still drive, go out alone, run errands, and manage her funds. She check-marked that her conditions affected her ability to get up, squat, bend, stand, walk, sit, kneel, and use her hands. She did not check the boxes for mental limitations in memory, completing tasks, concentration, understanding, following instructions, and getting along with others. She could pay attention for as long as necessary, follow written and spoken instructions, and get along with authority. She did not have unusual behavior or fears. Reading positive thinking articles helped her handle stress. Praying and keeping positive helped her handle changes in routine. She is right-handed. She claimed that she felt pain and numbness in her hands. She could walk for half an hour before needing to stop and rest for 15 minutes, and could not reach, bend, or stand for too long. Walking gave her lower back pain. She slept with wrist braces as prescribed by a doctor. She now also had a collar or orthopedic brace/splint. Tr. 86-93, 348-355.

Romero's request for reconsideration of denial of disability benefits was denied on July 2. In her request, Romero stated not having additional evidence to submit. Tr. 227. The denial states that new evidence included surgery for carpal tunnel syndrome with good results, with future surgery for the other hand and back, but that there was no evidence that supported revision of the prior decision. Tr. 221-222, 228-234. I note that there is conflicting evidence in the record as to the date of the hand surgery cited in this denial notice. It appears that the first hand surgery took place in 2013. Tr. 543.

On August 15, Romero described her right hand, neck shoulders, and back pain as throbbing, burning, and acute. She consistently experienced pain all day. Medications helped but did not take the pain away. Her pain would begin in her hand and continue towards her arm, neck, shoulder, back, lower back, and hip. She claimed that her pain had worsened during the last 12 months. Before it would come and go, but now it increased and was constant. She also claimed that her medications offered little relief. She would use hot pads, ice, and pain ointments, and her husband would give her massages. Romero now claimed that her ability to think and concentrate changed because of her pain, and that she would forget things a lot. Tr. 94-96, 357-359.

Romero requested an administrative hearing on August 16 (Tr. 236), and filed another disability report on August 17, which contains the same allegations of pain and physical limitations as those she reported on April 12. Tr. 362, 366.

A hearing before an ALJ was held on June 20, 2013. Tr. 37-66, 236-246, 264. Alina Jimenez de Kurtanich, a vocational expert ("VE"), testified. Tr. 19, 40, 262-263. The ALJ asked the VE if a person with Romero's age, academic background, and previous jobs with the ability to do light work could perform Romero's previous jobs. The ALJ specified that light work as defined in 20 C.F.R. § 404.1567(b) required the following: lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit about 6 hours in an 8-hour workday; stand and/or walk about 6 hours in an 8-hour workday; with no limitations pushing and/or pulling; frequently climb ramps or stairs; frequently lean or crouch; occasionally stoop or crawl; occasionally climb ladders, ropes, scaffolds; and frequent but not constant handling or fingering with both hands. The VE answered that such a person could not perform Romero's previous jobs because they involved constant use of her hands but could perform other light jobs in the national economy such as counter clerk, account investigator, and furniture rental consultant. Tr. 44, 46-47.

Romero's attorney asked the VE if such a person as described in the ALJ's hypothetical question, but who additionally had marked limitations to perform fine and gross manipulation, fingering, or feeling of skin receptors, could work. He defined marked as being able to perform that task less than occasionally, that is, for up to one-third of the time. The VE answered that if the person could occasionally use her hands to manipulate, finger, or feel, then she could work. If she could use her hands less than occasionally, then there would be no jobs for her. Counsel then asked if such a person could work if she had to alternate positions at will and could not tolerate standing, sitting, or walking without interrupting production at least three times in one hour because of the pain. The VE answered that she could not. Counsel also asked the VE whether such a person could work if she additionally had marked limitations in paying attention and concentrating and limited ability to tolerate criticism associated with supervision (between one-third and two-thirds of the time). The VE answered that she could not. Counsel further asked if such a person could work if she could only pay attention and concentrate between a third and two-thirds of the time because of the pain she felt due to her physical conditions. The VE answered that she could not. Tr. 50-54.

On December 27, 2013, the ALJ found that Romero was not disabled under sections 216(i) and 223(d) of the Act since she could perform other work. Tr. 13-35. The ALJ sequentially found that Romero:

(1) worked after her alleged disability onset date but her income did not rise to the level of substantial gainful activity (Tr. 21);

(2) had severe impairments: degenerative disc disease and spondylosis of the cervical spine, uncovertebral hypertrophy of cervical sprain, lumbar mild straightening related to muscle spasms and spondylosis, and carpal tunnel syndrome (Tr. 21);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526) (Tr. 23-24);

(4) could not perform past relevant work but retained the RFC to perform light work as defined in 20 CFR 404.1567(b) (lift and carry 20 pounds occasionally and 10 pounds frequently; sit six hours in an eight-hour workday; stand and/or walk 6 hours in an eight-hour workday; no limitations pushing and/or pulling; frequently climb ramps or stairs; frequently kneel or crouch; occasionally stoop or crawl; occasionally climb ladders, ropes, or scaffolds; and frequent but not constant handling or fingering with both hands) and unskilled work (Tr. 24, 29-30); and

(5) could perform jobs in the national economy as per her age, education, work experience, and RFC, such as counter clerk, account investigator, and furniture rental consultant.  (Tr. 32).

The ALJ afforded little weight to Dr. Nevares's opinion that Romero would require surgery in the future for her carpal tunnel syndrome because it was speculative and inconsistent with the medical evidence in the record, particularly her admissions of mostly unrestricted daily activities and a pain of 1-2 in a scale of 1-10. The ALJ gave great weight to Dr. P. Nieves's assessment that Romero could perform light work. Tr. 28.

The ALJ stated that she considered that the record showed mild restrictions in activities of daily living, in social functioning, and in concentration, persistence, and pace, with no episodes of decompensation.  The ALJ further found that although Romero offered evidence of a diagnosis of depression, the "scanty treatment notes" did not evidence a mental impairment that lasted or was expected to last for a continuous period of 12 months or that caused more than minimal limitation in her ability to perform basic mental work activities and therefore was not a severe impairment. The ALJ gave Dr. Acevedo's opinion little weight because that was not his area of expertise and

his report was unsupported by treatment notes or clinical findings consistent with the reported limitations and was inconsistent with other substantial evidence in the record. Tr. 21-23.

On May 23, 2015, the Appeals Council denied Romero's request for review of the ALJ's decision, rendering it the final decision of the Commissioner. Tr. 1-9, 381. The present complaint followed. Docket No. 1.

**DISCUSSION**

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process contained in 20 C.F.R. § 404.1520 that based on Romero's age, education, work experience, and RFC, there was work in the national economy that she could perform, thus rendering her not disabled within the meaning of the Act. In this case, the ALJ used a VE to determine whether substantial gainful activity existed in the national economy that Romero could perform, and determined that Romero retained the RFC to perform light unskilled work.

The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). Romero argues that, in determining her RFC, the ALJ erroneously substituted her own opinion for the medical opinions in the record concerning her mental and musculoskeletal impairments. Romero further contends that the ALJ did not deploy the correct legal standards because the ALJ posed a hypothetical question to the VE that did not include all of her physical and mental limitations. *See Manso-Pizarro*, 76 F.3d at 16. The Commissioner argues that there is substantial evidence in the record to support the ALJ's decision that Romero was not entitled to disability benefits and requests that the ALJ's decision be affirmed.

An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* And ordinarily, an "ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso-Pizarro*, 76 F.3d at 17. So when "a claimant has sufficiently put

her functional inability to perform her prior work in issue, the ALJ must measure the claimant's capabilities, and 'to make that measurement, an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person.'" *Id.* (*quoting Santiago*, 944 F.2d at 7). In "order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." *Arocho*, 670 F.2d at 375. Accordingly, the ALJ "must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions." *Id.* Also, when determining which work-related limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529.

Romero specifically argues the following:

1- The ALJ, as a lay person, could not interpret the medical evidence considered by Dr. Nevares and therefore did not understand the severity of the condition that led Dr. Nevares to assess that she would likely require surgery for her carpal tunnel syndrome, thus giving little weight to Dr. Nevares's opinion with no "good reasons" to discard it from the hypothetical question.

2- The ALJ erred in giving little weight to Dr. Acevedo's opinion regarding her mental health and offering no "good reasons" for disregarding his opinion. The ALJ explained in her opinion that she gave little weight to Dr. Acevedo's opinion because psychiatry was not his area of expertise and because his report was unsupported by treatment notes and the limitations he reported were inconsistent with his own clinical findings and other evidence in the record.

3- The ALJ should not have discarded Dr. H. Vargas's operation notes because they were illegible, and should have instead further developed the record by requesting a transcript of Dr. H. Vargas's notes so that the ALJ and the State Agency non-examining consultants could properly consider all of the evidence in making an RFC assessment.

4- The ALJ incorrectly discredited Romero's allegations of pain and functional limitations because Romero reported that she could take care of some of her personal needs.

The regulations require an ALJ to carefully consider a medical source's opinion about any issue. SSR 96-5p, 1996 SSR LEXIS 2.  In reviewing the evidence, the ALJ should give "*more* weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)."  20 C.F.R. § 404.1527(c)(2).  The opinion of a treating physician is presumed to carry controlling weight as long as it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *Id.*; SSR 96-2p, 1996 SSR LEXIS 9.

The ALJ did not give controlling weight to Dr. Nevares's opinion, finding that the severity of the restrictions offered by Dr. Nevares were "conclusory, unexplained, unsupported and inconsistent" with other SIF medical evidence, which is a valid reason to discount a medical assessment, if his opinion was weighed based on the factors set forth in 20 C.F.R. §§ 404.1527(c), which include:

(1) the examining relationship (more weight is given to the medical source who has examined the claimant);

(2) the treatment relationship (more weight is given to a treating source's opinion because she/he can provide a detailed, longitudinal picture of a claimant's impairments, including the length of the treatment relationship and the frequency of treatment, and the nature and extent of the treatment relationship);

(3) the supportability of the treating source's opinion with relevant evidence such as medical signs and laboratory findings;

(4) the consistency of the treating source's opinion with the record as a whole; and

(5) the area of specialty of the medical source offering the opinion.  20 C.F.R. § 404.1527(c).

Here, Romero was longitudinally treated under the auspices of the SIF starting in 2008 for carpal tunnel syndrome with medications and physical therapy to increase movement and decrease pain and numbness in her hands.  Dr. Nevares, a hand surgeon, was an attending physician for the SIF and a specialist in the field, so his record, in conjunction with the rest of the SIF record, portrays a lengthy record of treatment for a condition that increased in pain and severity.  Light work, which includes sedentary work, requires good use of the hands and fingers for repetitive hand-finger actions, and Dr. Nevares assessed that Romero could use her hands for manipulative

activities and fine manipulation for 30 minutes. 20 C.F.R. § 404.1567(a) & (b); SSR 83-10. There is also clear evidence on the record of left hand surgery by another doctor, Dr. Oscar Vargas, one month after the hearing before the ALJ was held but before the ALJ's decision came out, and of right hand surgery six months after the first surgery. To me, the above evidence strongly suggests that her hand conditions were more serious than reflected in the RFC assessment used for the hypothetical question provided to the VE, and as such remand is warranted to further assess Romero's hand limitations.

Also, Romero reported progressively needing more help to perform household chores and take care of her personal needs because her hands would hurt and/or go numb. Romero argues that her ability to take care of her personal needs and do some household chores should not serve as basis to discredit her physical and mental allegations because, in contrast to a vocational setting, she may perform these tasks at her own pace and with help of others without the exigencies of production requirements having to be met. Her pain allegations add to my impression that the issue of her hand conditions should be revisited.

With regards to Romero's mental conditions, the ALJ found that the record contains a diagnosis of depression, but that the "scanty treatment notes" did not evidence a mental impairment that lasted or was expected to last for a continuous period of 12 months or that caused more than minimal limitation in her ability to perform basic mental work activities and therefore was not a severe impairment. A claimant seeking disability benefits based upon mental illness must establish that it impedes her from performing the basic mental demands of competitive remunerative unskilled work on a sustained basis, that is: (1) understand, carry out, and remember simple instructions; (2) respond appropriately to supervision, coworker, and usual work situations; and (3) deal with changes in a routine work setting. *Ortiz*, 890 F.2d 520, 526 (1st Cir. 1989) (*quoting* SSR 85-15). For a claimant to understand, carry out, and remember simple instructions in any job, she must have the mental ability to remember very short and simple instructions, and the "ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)." SSA's Program Operations Manual System ("POMS") DI 25020.010(B)(2)(a). "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C)(3).

The ALJ noted that Dr. Acevedo was not a medical expert in mental health and that the record did not support his RFC assessment that the pain was severe enough to interfere with her ability to pay attention and concentrate in performing simple work tasks, and thus did not assign controlling weight to his opinion. Under 20 C.F.R. § 404.1527(c), the ALJ may assign less weight to the opinion of a source who is not a specialist and whose opinion is not consistent with the record as a whole. However, the record does contain evidence of treatment by Dr. J. Nieves, which the ALJ found to be "mostly unremarkable."

Dr. J. Nieves's treatment record, plus Romero's own allegations of being able to take care of some of her personal needs and perform some household chores, do not seem to establish that she is impeded from performing unskilled work, except for Dr. J. Nieves's findings regarding memory problems which hint at Romero having possible limitations in her ability to remember very short and simple instructions. Even so, the record does not contain any evidence of mental exams or other medical evidence that would support a medical opinion on memory impairment, and I therefore agree with the ALJ that the record does not contain evidence to support a finding of a mental impairment that would impede Romero from performing unskilled work.

Furthermore, once the ALJ decides what weight to give a treating source, under the "good reasons" requirement, she is required to include in the notice of determination "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. The ALJ may reject a treating physician's opinion when it is not supported by clinical evidence or is inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Arias v. Comm'r Soc. Sec'y*, 70 F. App'x 595, 598 (1st Cir. 2003). The ALJ's decision contains a lengthy summary of the evidence she considered, which includes evidence of hand function evaluations by treating sources (Dr. Acevedo, SIF, Dr. Nevares), the consultative neurologist Dr. Perez, and Dr. P. Nieves, the non-examining medical consultant. I consider the discussion of the evidence sufficient to give the court notice of the weight given to Dr. Nevares's and Dr. Acevedo's opinion.

Additionally, as to Romero's argument that the ALJ should have further developed the record as to Dr. H. Vargas's operation notes, while the ALJ has a duty to develop an adequate record on which reasonable conclusions may be based, *see Heggarty v. Sullivan*, 947 F.2d 990, 998 (1st Cir. 1991), in this case, although the surgical report is partly illegible, there is other post-

operative evidence that clarifies that Romero fully recovered from her surgery. Romero has not shed little light on what additional information might have been considered had the ALJ reached out to Dr. H. Vargas.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is vacated, and the matter is remanded for further proceedings. Upon remand, the ALJ is free to consider any additional evidence deemed necessary to aid in determining whether Romero is disabled. This ruling should not be considered by the parties as an opinion on the ultimate merits of Romero's disability claim upon remand.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of March, 2017.

        **S/Bruce J. McGiverin**
        BRUCE J. MCGIVERIN
        United States Magistrate Judge